**STANFORD HOTELS CORPORATION,**
**Appellant,**

v.

**POTOMAC CREEK ASSOCIATES,**
**L.P., Appellee.**

**Nos. 07–CV–453, 07–CV–480.**

District of Columbia Court of Appeals.

Argued Feb. 10, 2009.

Decided April 21, 2011.

Daniel F. Katz, with whom Dennis M. Black, Stephen D. Andrews and Charles T. Kimmett, Washington, DC, were on the brief, for appellant.

Peter Buscemi, Washington, DC, with whom Brooke Clagett was on the brief, for appellee.

Before RUIZ, THOMPSON and OBERLY, Associate Judges.

RUIZ, Associate Judge:

Stanford Hotels Corporation ("Stanford") seeks reversal of the trial court's grant of summary judgment to appellee, Potomac Creek Associates, L.P. (now reincorporated as Potomac Creek, L.L.C., "Potomac Creek"), denying specific performance of an agreement to negotiate for Stanford's purchase of the Loews L'Enfant Plaza Hotel ("Hotel") from Potomac Creek. The trial was bifurcated into two phases: the first for a determination of liability, followed by a determination of remedy. Presiding over the liability phase of the trial, Judge Leonard Braman concluded that Potomac Creek was liable for breach of a preliminary contract which bound the parties to "negotiate in good faith with a view to signing" a final agreement for the sale of the Hotel, and had acted in bad faith by refusing to sign the final agreement they had negotiated. Presiding over the second phase of the trial, Judge Brook Hedge determined that specific performance, the only remedy requested by Stanford, was unavailable as a matter of law and, therefore, granted Potomac Creek's motion for summary judgment. Because we conclude that specific performance was available to enforce the

preliminary contract in accordance with its terms, we reverse the judgment and remand the case to the trial court for further proceedings to determine whether specific performance is warranted by the facts of this case.

## I. Facts

The negotiations for the sale of the Hotel played out against an intricate background. Because the course of the negotiations and their context are relevant to the legal issues raised in this appeal, we describe them in some detail, based on the facts found by the trial court. Sarakreek Holdings, N.V. (Sarakreek) is a Dutch company that owned several properties in the United States. It is governed by a classic European double board consisting of a Board of Management, made up of company executives, and a Supervisory Board, composed of non-executives, or outside directors. The Board of Management is responsible for the day-to-day operations of the company, including management of Sarakreek's investments. At the times relevant to this case, Sarakreek's Board of Management had between two and three directors and its Supervisory Board had five directors. The "A–Director" of the Board of Management had authority to bind the company unilaterally, while the other Board of Management directors, the "B–Directors," could bind the company only with the A–Director's approval.

In October of 1995, Westbrook Real Estate Fund ("Westbrook"), a U.S. venture capital company, made a participating convertible loan of $22 million to a Sarakreek subsidiary, Hartford Creek Associates, L.P. ("Hartford Creek"). Hartford Creek's assets were pledged as collateral. As part of this deal, Westbrook's Vice President, Jeffrey Rutishauser, became Sarakreek's A–Director, and Westbrook took over three of the five votes on Sarakreek's Supervisory Board.[1]

In February of 1997, Sarakreek acquired a mixed-use complex, known as L'Enfant Plaza, which included office and retail facilities, as well as the 370–room Loews L'Enfant Plaza Hotel ("the Plaza property").[2] Upon acquisition of the Plaza property, Sarakreek formed Potomac Creek (appellee), a wholly-owned subsidiary, for the sole purpose of holding title to the Plaza property. The transaction was partly financed by Paine, Webber & Company ("Paine Webber," now owned by its successor-in-interest UBS) through a loan of more than $50 million. Additionally, to assist in the acquisition of the Plaza property, Westbrook, through a subsidiary, T/W ERIC Funding L.L.C., loaned an additional $15 million to Hartford Creek (as previously indicated, also a Sarakreek subsidiary). This note, referred to as the "C-note" carried a 20% rate of interest. A desire to retire the high rate C-note was one of the reasons for Sarakreek's interest in selling the Hotel separate from the rest of the Plaza property.[3]

---

**1.** According to Rutishauser, a participating convertible loan "has as compensation a participation in the cash flow of the collateral, which in this case were the assets of Hartford Creek Associates, and could be converted into equity at the holding company level at the option of the lender under certain circumstances."

**2.** Sarakreek's acquisition of the Plaza property was accomplished through the purchase of

stock from Eastern Realty Investment Corporation ("ERIC"), which held title to the property.

**3.** Rutishauser testified that the sale of the Hotel apart from the Plaza property had always been anticipated, both to retire the C-note and to take advantage of a net operating loss credited to Sarakreek following its purchase of ERIC (and simultaneously the Plaza property). According to Rutishauser, the net

On May 14, 1997, Potomac Creek retained Hodges, Ward, Elliot, Inc., an experienced hotel broker, to sell the Hotel. Stanford, a private California-based company that owns and manages hotel properties in the United States, was the successful bidder, offering $48.75 million, nearly $12 million over the Hotel's appraised value at the time. On October 24, 1997, Laurence Lui, Stanford's president, submitted a proposal to Sarakreek, setting out the offer price, as well as several other major aspects of the offer. Stanford's proposal was to expire by its terms at 12:00 p.m. on October 29. Rutishauser, on behalf of Sarakreek, suggested modifications to the proposal, and signed the letter on October 28; Lui accepted the modified letter on October 30, 1997.

At trial Rutishauser, on behalf of Potomac Creek's corporate parent Sarakreek, conceded that the letter, as modified and signed by both parties, constituted a binding contract ("Preliminary Agreement") that obligated the parties to negotiate in good faith a Definitive Agreement for the purchase and sale of the Hotel on the price and other terms in Stanford's offer. Specifically, Paragraph 5 of the Preliminary Agreement provided:

> Definitive Agreement. Buyer and Seller shall negotiate in good faith with a view to signing a Definitive Agreement within ten (10) days after execution of this letter, which agreement shall *inter alia,* include the terms and conditions set forth in this offer.

Although the Preliminary Agreement provided that the parties would execute a "Definitive Agreement" within ten days, Judge Braman found that "[t]he parties had plainly underestimated the complexities involved," primarily because of the need to separate out—legally, financially, and in terms of shared costs—the Hotel from the rest of the Plaza property. Negotiations in furtherance of reaching a Definitive Agreement continued beyond the ten days and lasted several months, into May of 1998. Judge Braman found that the duration of the Preliminary Agreement "was extended through the resumption of negotiations."

The "complexities" of the sale of the Hotel, however, were only partially responsible for the delay in reaching a Definitive Agreement. Concurrent with its efforts to sell the Hotel to Stanford, Sarakreek also pursued a buyout of Westbrook, both to retire the high interest $50 million C-note related to the purchase of the Plaza property in 1997, and to effect a complete purchase of Westbrook's interest in Sarakreek's Hartford Creek subsidiary that served as collateral for the 1995 convertible loan for $22 million (which purchase resulted in the placement of Rutishauser on Sarakreek's Board of Management Directors). Such a buyout would return control of Sarakreek to Dutch hands. As a result, Paine Webber served Sarakreek in dual roles: it was to provide the financing for the buyout of Westbrook and also to bifurcate its mortgage on the Plaza property so as to allow for the separate sale of the Hotel to Stanford. However, whereas Paine Webber proved flexible in providing a deadline within which to complete the bifurcation of the mortgage, Westbrook imposed a non-negotiable deadline of December 15, 1997, within which to effect the buyout of its interest in Hartford Creek and its properties. This tight deadline resulted in Rutishauser's "directing" that Paine Webber work on the Westbrook buyout

operating loss would allow Sarakreek to offset a taxable gain, such as a gain resulting from the sale of the Plaza property. He further testified that in order to take advantage of the NOL, a portion of the Plaza property had to be sold first.

first. Thus, as a result of prioritizing its focus on effecting the Westbrook buyout, Potomac Creek was not diligent in negotiating with Stanford the terms of the Definitive Agreement for the sale of the Hotel, which, as mentioned, took several months longer than initially contemplated in the Preliminary Agreement. During this time, Rutishauser, on behalf of Westbrook, was the decisive "A-director" on Sarakreek's Board of Management and thus effectively controlled Sarakreek's Potomac Creek subsidiary. However, Rutishauser never informed Stanford of Sarakreek's concurrent effort to effect a buyout of Westbrook's interest in Hartford Creek, an effort that was to take precedence over Potomac Creek's sale of the Hotel to Stanford.

Ultimately, the buyout was never completed because of "a lack of agreement on a few substantive points," which resulted in "plenty of recriminations" among Westbrook, Sarakreek, and Paine Webber. Once the buyout attempt had failed, Rutishauser thought that Paine Webber had become "less cooperative," thus "impact[ing] [Sarakreek's] ability to restructure or bifurcate" the mortgage on the Plaza property, a necessary condition for the sale of the Hotel to Stanford. Consequently, there were no direct communications between Potomac Creek and Stanford from late December of 1997 through late March of 1998.

Despite this lack of communication, Sarakreek remained interested in selling the Hotel and Stanford in acquiring it. On January 16, 1998, Rutishauser addressed a memorandum to the Westbrook representatives on the Sarakreek Supervisory Board providing fourteen reasons why the sale of the Hotel to Stanford ought to

proceed. Thereafter, however, apparently still interested in buying out Westbrook, on February 4, 1998, Sarakreek's Supervisory Board met and decided to sell *all* of Sarakreek's assets, including the Hotel and the rest of the Plaza property. At this meeting, it was also decided to seek reinstatement of Paine Webber's earlier consent to bifurcate the mortgage on the Plaza property. In "[e]arly to mid March," Stanford was notified by Rutishauser that Paine Webber had approved a reinstatement of the bifurcation agreement and negotiations for the sale of the Hotel were renewed.[4] On March 26, Stanford received a draft of the Definitive Agreement from Potomac Creek's counsel. The draft responded to comments Stanford's lawyer had made in November, before the lull in negotiations; Stanford received another revised draft on April 17. On May 8, two "execution copies" of the 27-page Definitive Agreement with ten exhibits totaling 100 pages, were sent to Stanford for its approval and signature. Lui, on behalf of Stanford, signed the Definitive Agreement on June 2, 1998. In the cover letter returning the signed agreement to Potomac Creek's counsel, Stanford's lawyer stated that although Stanford was "still uncomfortable" with some of the provisions in the Definitive Agreement, it was "willing to move forward in a spirit of cooperation and desire[d] to consummate the transaction, subject to the terms and conditions" of the Definitive Agreement that Potomac Creek had sent for execution.

Neither Rutishauser, nor any other representative of Potomac Creek, would ever sign the Definitive Agreement that Potomac Creek's lawyers had "pressed" Stanford to sign. Judge Braman found that Rutishauser's actions in delaying and even-

---

4. Rutishauser twice claimed in his testimony that he informed Stanford that the Hotel "deal" was terminated, but the trial court, finding Rutishauser's claims to be self-serving, did not credit this testimony.

tually refusing to sign the Definitive Agreement were disingenuous and unjustifiable in light of the fact that every major hurdle to the sale of the Hotel had been overcome.[5] Judge Braman concluded, "[w]hile Rutishauser wanted Stanford's signature on the Definitive Agreement, he did not in fact have any intention to sign it himself unless a more advantageous[ ] . . . alternative failed to materialize."

The "more advantageous" alternative Judge Braman referred to was the refinancing of the entire Plaza property that Sarakreek, unbeknownst to Stanford, had authorized in early February and pursued while it was also in negotiations for the sale of the Hotel to Stanford during March–June 1998. Refinancing the entire Plaza property would allow Sarakreek to fulfill its earlier frustrated desire to buy out Westbrook's interests in, and regain Dutch control over, Sarakreek's companies. On March 24, Sarakreek's Supervisory Board specifically authorized John Mannix and his partner, Jeffrey Gwin, who had been managing the Plaza property,[6] to bid on all assets of the Plaza property, including the Hotel. On August 12, Sarakreek's Supervisory Board approved their proposal, which involved a refinancing of all the Plaza property by Credit Suisse First Boston.

Meanwhile, as Sarakreek was negotiating to complete the refinancing of the Plaza property with Mannix and Gwin, its Potomac Creek subsidiary continued its negotiations with Stanford to effect its purchase of the Hotel. As Judge Braman phrased it, "Sarakreek–Potomac [Creek] covertly kept working both sides of the street." Indeed, following several months of silence between Stanford and Potomac Creek, Rutishauser explicitly reopened negotiations with Stanford for the sale of the Hotel on March 26, *two days* after the Sarakreek Board had asked Mannix and Gwin to submit a proposal for the entire property. Notwithstanding that the renewed negotiations induced Stanford to "invest further time and money for over five months," it was only on August 17, two months after Stanford had signed the Definitive Agreement at Potomac Creek's urging and five days *after* Sarakreek's Supervisory Board had approved Mannix and Gwin's proposal with Credit Suisse financing, that Stanford was informed that Potomac Creek was "considering" refinancing the Plaza property instead of selling the Hotel to Stanford. As Judge Braman found, even then, Rutishauser "disingenuously" told Stanford that the odds of a refinancing were only "50/50," and he further professed that they were going "to make a big effort in trying to deliver the Hotel" to Stanford.

**5.** In addition to negotiating the Definitive Agreement, the parties had hammered out a number of details in a "Declaration of Easements, Covenants and Restrictions" that would be finalized after the Definitive Agreement, "as part of due diligence," and would be recorded with the actual transfer of the property at closing. The Declaration was necessary in order to "establish a *modus vivendi* between the soon-to-be-separated" components of the Plaza property to accomplish the sale of the Hotel to Stanford. Judge Braman noted that only four issues remained to be resolved in the Declaration, all involving the sharing of costs between the Hotel (to be owned by Stanford) and the rest of the Plaza property (to be owned by Potomac Creek, or a subsequent purchaser). These concerned water meter allocation, common area costs, air rights lease payments, and joint insurance costs. None involved significant amounts. The trial court relied on "undisputed evidence" that Stanford was willing to concede Potomac's position on all four issues if necessary to close on the sale.

**6.** Mannix and Gwin were concerned that if Sarakreek sold the Plaza property to a third party, their contracts to manage the property would be terminated.

The following month, on September 18, 1998, the Credit Suisse refinancing closed, permitting the buyout of Westbrook's interest in Sarakreek and its subsidiaries. Title to the Hotel passed by deed to the primary lender; other entities that participated in the refinancing received subordinate interests—secured and unsecured—in the Plaza property. The deed of trust provided for "defeasance," by which, through a substitution of collateral, the Hotel could be extricated from the financing obligations encumbering the property as a whole. Stanford was not informed of the refinancing until October 9, 1998, and Lui immediately protested to Rutishauser, invoking Potomac Creek's obligation under the Preliminary Agreement to negotiate in good faith. By then, as a result of the Westbrook buyout, Rutishauser had resigned from Sarakreek's Board. In a letter dated October 13, Mannix, on behalf of Potomac Creek, justified Potomac Creek's actions by citing Stanford's failure to tender a $500,000 deposit called for in the Preliminary Agreement. This was the first time Potomac Creek had mentioned that Stanford had not made the deposit. Judge Braman discounted Mannix's purported justification, concluding that "Stanford inadvertently forgot to make the deposit, and Potomac [Creek] never called it to account." Judge Braman found that Potomac Creek implicitly agreed to postpone the deposit when it submitted its first draft of the Definitive Agreement on November 4, 1997, which included a section providing for the payment of the deposit upon execution of that agreement, and gave Potomac Creek the option to terminate the Definitive Agreement if the deposit was not made. Because Potomac Creek never executed the Definitive Agreement, the deposit had not become due.

The refinancing of the Plaza property allowed Sarakreek to buy out Westbrook;

Rutishauser, who had been placed on Sarakreek's Management Board by Westbrook, resigned from the Board; and control of Sarakreek returned to its Dutch members. Before this management realignment took effect, however, several incentives had been put in place for those who had been involved in arranging the refinancing with Credit Suisse: payment of 1% (or $1.98 million) to Mannix's company; a 20% interest in the operating cash flow of the Plaza property for Mannix and Gwin, as well as an irrevocable five-year management contract with a fee totaling 3.5% of the gross revenues from the Plaza property. For his part, Rutishauser claimed that he was entitled to a share of the $1.98 million incentive fee paid to Mannix's company, and he received a $15,000/month consulting contract during the buyout for which he performed no services. Had Stanford purchased the Hotel, Mannix and Gwin "would have received little, if anything."

*The Trial Court's Findings on Liability and Remedy*

On April 3, 2003, after a six-day bench trial, Judge Braman completed the liability phase of the trial by issuing a fifty-nine page order making findings of fact and conclusions of law. Judge Braman rejected Stanford's contention that Potomac Creek was bound by the Definitive Agreement Lui had signed on behalf of Stanford. Judge Braman concluded that "the parties did not intend to depart from the practice customarily followed in the purchase and sale of a valuable commercial realty," and, therefore, that Potomac Creek was not bound to sell the Hotel by the provisions of the Definitive Agreement which had been signed only by Stanford.

Judge Braman came to a different conclusion with respect to the Preliminary Agreement. He found that the Prelimi-

nary Agreement was a binding contract, and was "operative from its inception on October 30, 1997, and extended through September 18, 1998, when Potomac [Creek] closed on its refinancing with Credit Suisse." The Preliminary Agreement's "express covenant of good faith persisted, as a consequence, throughout this period," as did the "implied obligation of good faith implicit" in every contract, citing *Hais v. Smith,* 547 A.2d 986, 987 (D.C.1988).

Judge Braman noted that Potomac Creek conceded that it had an obligation to deal exclusively with Stanford for the sale of the Hotel; Rutishauser testified this meant that "there was an obligation not to negotiate the sale of the Hotel with any other parties" while the Preliminary Agreement was in force. Evaluating Potomac Creek's actions against these obligations of good faith and exclusive dealing, Judge Braman found that Potomac Creek had breached the Preliminary Agreement by "abandoning" the negotiations with Stanford in favor of the unsuccessful Westbrook buyout in late 1997 and early 1998, and that it "broke faith with Potomac [Creek's] conceded obligation of exclusivity" by negotiating for the sale of the entire Plaza property (including the Hotel) to Mannix and Gwin. In addition to finding that Potomac Creek had failed its obligation to negotiate "in good faith," Judge Braman found that Potomac Creek had affirmatively acted in "bad faith," noting that the reactivation of negotiations for sale of the Hotel on March 26 "was conceived in bad faith" and that Potomac Creek's negotiations with Stanford were "subverted" when Sarakreek signed the Credit Suisse term sheet for the refinancing of the Plaza property on July 16, 1998. In concluding that Potomac Creek was liable for breach of the Preliminary Agree-

ment, Judge Braman focused on the language of Paragraph 5 that obligated both parties to "negotiate in good faith with a view to signing a Definitive Agreement,"— which, the court interpreted, "implicitly obligated each party to sign the Definitive Agreement once its terms were agreed upon." Notably, Judge Braman found that Potomac Creek's "failure to execute the Definitive Agreement for the Hotel Sale and closing on Credit Suisse's refinancing were ... acts of bad faith." Judge Braman noted that despite pressing Stanford for its signature on the Definitive Agreement, Potomac Creek delayed its own acceptance of the agreement, "invent[ing] pretexts," so as to "wait for the Credit Suisse financing to jell." Judge Braman concluded that:

> But for the refinancing, the sale of the Hotel would have been consummated, as the unresolved issues were comparatively minor, were not at [an] impasse, and were not deal breakers as Stanford was prepared to concede if necessary. The few open issues that remained were not resolved because Potomac [Creek] abandoned the negotiations for the sake of refinancing the Hotel and the rest of the Plaza property.... Potomac [Creek] is, therefore, chargeable with the circumstances of those issues being resolved and cannot seek advantage from its own breach.

(citations to the record omitted). Therefore, the court ruled, Potomac Creek's "refusal to sign" the Definitive Agreement was a breach of the Preliminary Agreement.

Following Judge Braman's determination of liability, the trial proceeded to Phase II for a determination of remedy. Stanford had abandoned all claims for damages and asked only for specific per-

formance.[7] Presiding over Phase II, on April 2, 2007, Judge Hedge granted summary judgment to Potomac Creek, after concluding that Stanford's request for "an order of specific performance requiring Potomac [Creek] to convey the Hotel to Stanford" was not legally available for Potomac Creek's breach of its obligation under the Preliminary Agreement, because it was not a contract for the sale of the Hotel. On April 10, 2007, Stanford filed a notice of *lis pendens*. Stanford filed a notice of appeal on April 30, challenging Judge Hedge's grant of summary judgment to Potomac Creek at the conclusion of Phase II of the trial; Potomac Creek has not cross-appealed Judge Braman's determination of liability in Phase I of the trial.

## II. Specific Performance

■ "We review the grant of summary judgment *de novo.*" *Minch v. District of Columbia,* 952 A.2d 929, 936 (D.C.2008) (citation omitted). The trial court granted summary judgment to Potomac Creek because it thought it could not award specific performance of the Preliminary Agreement. The question before us is therefore one of law: whether an award of specific performance was a remedy legally available to the trial court as a result of Potomac Creek's breach of the Preliminary Agreement. We hold that, in light of Judge Braman's findings, specific performance of the Preliminary Agreement in the form of an order that Potomac Creek sign the Definitive Agreement it had negotiated is an available remedy. We, therefore, reverse the grant of summary judgment to Potomac Creek and remand the case for further proceedings, so that the trial court

can decide whether such specific performance is appropriate in the circumstances of this case.

■ We begin by noting that the Superior Court of the District of Columbia has authority to grant specific performance. "[The] trial court exercising its general equity jurisdiction has discretion to grant specific performance of a valid contract." *Clay v. Faison,* 583 A.2d 1388, 1390 (D.C. 1990) (citing *Flack v. Laster,* 417 A.2d 393, 400 (D.C.1980)); *see also* D.C.Code § 11–921(a) (2001) (referring to Superior Court's jurisdiction over "any civil action or other matter (in law or in equity)").

Addressing Stanford's request for specific performance in this case, Judge Hedge framed the issue as whether "an order requiring Potomac [Creek] to convey the Hotel to Stanford is a proper remedy for Potomac [Creek's] breach of the Preliminary Agreement." Judge Hedge concluded that "[t]he extraordinary remedy of specific performance, although typically favored in contracts involving land, is not appropriate in this case because no contract for the sale of the Hotel exists." While that is true, as far as it goes, we believe it does not go far enough in identifying the precise issue in light of Judge Braman's findings during Phase I of the trial. As Judge Braman found, by executing the Preliminary Agreement, which "required good faith negotiations 'with a view to *signing* a Definitive Agreement[,]' " Potomac Creek had obligated itself to negotiate exclusively and in good faith with Stanford *and to sign* a Definitive Agreement if they were able to agree on terms. Judge Braman found that Potomac Creek did not negotiate in good faith; instead, it "aban-

---

7. Stanford's complaint initially asked for specific performance and, in the alternative, compensatory damages, consequential damages, prejudgment and post-judgment interest, and attorney's fees and costs. Prior to Phase I of trial, over Potomac Creek's objection, Stanford requested that the case be tried to the court, dropped all requests for damages, and sought only specific performance and attorney's fees.

doned" the negotiations, "broke faith" with its obligation to deal exclusively with Stanford for the sale of the Hotel, deceived Stanford as to its real intentions, led Stanford to believe that Potomac Creek intended to sell the Hotel when it had already agreed to include the Hotel in a refinancing with a third party, and, ultimately, acted in bad faith in refusing to sign the Definitive Agreement after all its terms had been agreed upon. The issue in this case with respect to specific performance, in other words, is more precisely framed as whether an order requiring Potomac Creek to *sign* the Definitive Agreement is an available remedy for breach of its obligation, under the Preliminary Agreement, to negotiate in good faith "with a view to signing" a Definitive Agreement reached as a result of negotiations.

 That the contract Stanford sought to enforce is characterized as a "Preliminary Agreement" is not dispositive, as "[t]he remedy of specific performance is not limited to any particular class of contracts." AM.JUR.2D SPECIFIC PERFORMANCE § 121.

> Where ... the contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific performance as for a court of law to award judgment of damages for its breach.

4 POMEROY, EQUITY JURISPRUDENCE § 1404, at 1040 (Symons, ed., 5th ed. 1941).

In deciding that the Preliminary Agreement was not specifically enforceable, Judge Hedge characterized the Preliminary Agreement as a "Type II" agreement, referring to the well-known formulation by Judge Leval that classifies preliminary agreements as "Type I" or "Type II":

> Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. . . .
>
> The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate [*i.e.*, ultimate] objective within the agreed

framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

*Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987) (footnote and citation omitted), *cited in, e.g., Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir.2008).

■ In applying the Type I—Type II distinction to this case, we agree with Judge Hedge's assessment that the Preliminary Agreement between Stanford and Potomac Creek is of the second type, in that it did not bind the parties to their "ultimate contractual objective"—sale of the Hotel to Stanford—but to "the obligation to negotiate the open issues in good faith in an attempt to reach the alternative [*i.e.*, ultimate] objective within the agreed framework." *Id.* It is with respect to this obligation that the relief requested and Judge Braman's findings of fact become critical. What Stanford seeks is specific performance, not of the Definitive Agreement, but of the Preliminary Agreement. Potomac Creek does not contend that the Preliminary Agreement is not a binding contract or that it is not enforceable; its argument essentially is that it is not bound by the terms of the Preliminary Agreement to sell the Hotel. We can agree with that narrow point. Judge Braman found, however, that when they entered into the Preliminary Agreement, the parties intended to sign the Definitive Agreement if they could come to agreement on its terms. *See id.* at 499 ("In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached."). Judge Braman also found that the parties did, in fact, come to agreement on all of its terms (noting, once again, that four minor items remained to be finalized in the Declaration that was not to be executed until closing, whose terms Stanford would concede in any event), and that the Definitive Agreement would have been signed by Potomac Creek but for its bad faith refusal to do so once the refinancing with Credit Suisse closed. Potomac Creek does not challenge Judge Braman's well-founded findings. Thus, this is neither a situation where the parties' "good faith differences in the negotiation of the open issues ... prevent[ed] a reaching of final contract," nor a situation where the parties "los[t] interest as circumstances change[d] and ... mutually abandon[ed] the negotiations." *Id.* at 498. An order that Potomac Creek sign the Definitive Agreement would, therefore, constitute specific performance of obligations it undertook, and pressed on Stanford to its detriment, under the Preliminary Agree-

ment.[8] If Potomac Creek had intended to avoid this result, it could have done so; but the Preliminary Agreement does not disclaim liability or otherwise limit or liquidate damages for breach. *See id.* (noting that a party that does not wish to be bound "can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement' "); *Vacold,* 545 F.3d at 125–26.

 If, however, the parties had not yet come to agreement on the terms of sale and drafted a Definitive Agreement ready for execution, the specific performance Stanford seeks might not be available as a remedy. This is due to the principle that specific performance "is a remedy that compels the performance of the contract in the *precise terms* agreed upon." *Drazin v. American Oil Co.,* 395 A.2d 32, 34 (D.C.1978) (emphasis in original); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 363 (1981). Moreover, "[a] promise will not be specifically enforced if the character and magnitude of the performance would impose on the court burdens in enforcement or supervision that are dispropor-

tionate to the advantages to be gained from enforcement and to the harm to be suffered its denial." RESTATEMENT (SECOND) OF CONTRACTS § 366 (1981). In other words, courts will not lightly undertake responsibility for overseeing compliance following the award of specific performance, as would have been required here if the parties had not already reached agreement on the terms of, and drafted, the Definitive Agreement. *See* POMEROY, *supra,* § 1405b, at 1048 ("Although the contract is valid, and the defendant is able to do what he has undertaken to do, if, through the want of appropriate means and instrumentalities, the court is unable, while pursuing its ordinary modes of administering justice, either to render a decree or to enforce the decree when made, then the remedy will be refused."). Whether specific enforcement of the Preliminary Agreement carries such a risk for the court depends on the extent to which the court must be involved beyond ordering execution of a viable document with terms the parties have negotiated and agreed upon.[9]

**8.** We emphasize that, even though it foreseeably could lead to the transfer of the Hotel to Stanford, ordering Potomac Creek to sign the Definitive Agreement is not tantamount to effectuating the sale of the Hotel. By signing the Definitive Agreement, Potomac Creek will undertake obligations toward that goal, but so will Stanford. It remains to be seen whether both will be able to comply with their obligations and whether conditions necessary to an actual sale and transfer of the Hotel can be satisfied.

**9.** Both parties agree that the Definitive Agreement (and perhaps the Declaration) needs to be "updated." Each proffered its version of an updated Definitive Agreement; they are not included in the Joint Appendix provided to this court. Potomac Creek's counsel contended that although "we don't have any problem" signing the Definitive Agreement as it existed in 1998, Stanford was asking that Potomac Creek be ordered to sign a "new

agreement." Stanford countered that the "necessary" updates involved "some definitions" that had to be modified, and substitution of parties who "took [title] subject to [Stanford's] lawsuit." Stanford argued that, to the extent that modifications were necessary, it was "because [Potomac Creek] walked away in bad faith and we've been litigating for seven years." Initially, Stanford took the position that a substantive provision that called for Stanford to pay one half ($1.15 million) of a debt owed to Paine Webber was no longer operative because the debt no longer existed. But in response to Judge Hedge's insistence that "the point of specific performance is to take you back to wherever you were in '98 which is when the agreement would have been signed," Stanford's counsel conceded that the payment would be made if the court "believed that sticking with the 1998 document requires that [Stanford] pay the $1.15 million, we're happy to do that and it doesn't preclude specific performance." Be-

■ Potomac Creek argues that to order it to sign the Definitive Agreement would abrogate the essential requirement that a party assent to be bound. Not so. We, of course, agree that an intent to be bound to an obligation is a core tenet of contract law. *See Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C.1995). The trial court's finding of fact is critical in this regard because Judge Braman found that in the Preliminary Agreement the parties "contemplated that both parties 'shall' sign as well as negotiate." To order Potomac Creek to sign the Definitive Agreement, therefore, does not impose a contractual obligation on an unwilling party by judicial fiat; rather, it holds a party to an obligation it freely undertook, and then proceeded to breach in bad faith. If, as Judge Hedge noted, there is not another decided case where a court ordered a party to sign an agreement pursuant to a preliminary Type II agreement of the sort involved here, that is likely because there has not been another case where a party bound itself to sign a subsequent agreement, as Judge Braman found that Potomac Creek-perhaps unusually-did here, *cf. Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 295 F.Supp.2d 1063, 1073 (D.Minn.2003) ("In signing the Term Sheet, [the defendant] agreed to execute, or at the very least to negotiate in good faith, long-term leases [that were contemplated by the Term Sheet]."), *aff'd,*

408 F.3d 460 (8th Cir.2005); or another case in which, as here, the party that agreed to negotiate in good faith toward signing a final agreement actually delivered the execution copy of the agreement to the counter-party for its signature, and then declined to sign itself.[10]

The legal question before us is one of remedy, whether specific performance is an available remedy to enforce the Preliminary Agreement. In the trial court, Potomac Creek agreed that the Preliminary Agreement was a binding contract that obligated it to negotiate in good faith and, as recognized in Judge Hedge's Order, Potomac Creek argued that the trial court could order it to perform by requiring it to engage in good faith negotiations. Further negotiation was unnecessary, however, because, as Judge Braman found, the parties had already come to agreement on all terms for the Definitive Agreement and the four minor points outstanding in the Declaration would be conceded by Stanford in Potomac Creek's favor. What remained was the last step required to complete the good faith negotiation that the parties undertook, signing the agreed-upon contract. Having conceded that some sort of specific performance was appropriate, Potomac is hard-pressed to explain why the ultimate step of signing the Definitive Agreement, which was the point of the negotiations, is beyond the power of the court.

cause Judge Hedge concluded that specific performance was not available to enforce the Preliminary Agreement, she did not determine what revisions would be necessary, how extensive they might be, and whether any necessary revisions would place undue burdens on the court that would outweigh Stanford's interest in specific performance of the contract.

**10.** The critical issue is whether the parties agreed to sign a document. Thus, for example, where a court interprets a lease's "Further Assurance" clause as requiring the lessor

to consent to the lessee's hypothecation on terms contemplated in the lease, the court will order the lessor to "execute and deliver" the necessary consent to the lessee as a remedy for breach of the undertaking not to withhold consent unless it substantially burdened the lessor's rights, a showing that the lessor could not in good faith sustain. *See 8648 KBLA, LLC v. Cross*, No. B176397, 2005 WL 2420430, at *7, 9–11, 2005 Cal.App. Unpub. LEXIS 9037, at *20, 27–29 (Cal.App. Oct. 3, 2005).

A grant of specific performance is generally conditioned upon the satisfaction of certain prerequisites: "(1) a valid binding contract; (2) definite and certain terms; (3) mutuality of obligation and remedy; (4) freedom from fraud and overreaching; and (5) lack of remedy at law." *Drazin*, 395 A.2d at 34 n. 3 (citing *Shreeve v. Greer*, 65 Ariz. 35, 173 P.2d 641, 644 (1946)); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 357–69 (1981) (explaining various circumstances under which an order of specific performance would be inappropriate). Here, there was no dispute that the Preliminary Agreement is a binding contract; the issue was what the Preliminary Agreement required. Judge Braman's interpretation of the Preliminary Agreement as requiring that both parties sign the Definitive Agreement once they had come to final agreement on its terms was based on the language of the Preliminary Agreement and on findings of fact concerning the parties' intent. As Judge Braman explained, "There would obviously be no purpose to successful negotiations without a concomitant duty to sign the final document." Judge Braman commented that these types of preliminary agreements are fair in that they commonly precede the execution of definitive agreements so as to "reduce the risk that labor and money will be wasted in the enterprise" of negotiating for the sale of a commercial property. We cannot say that ordering implementation of Judge Braman's reasoned interpretation of the Preliminary Agreement would render the contract "unfair" or "fraudulent." Indeed, any unfairness or overreaching was laid by Judge Braman at the feet of Potomac Creek which, by its actions, showed bad faith in its negotiations with Stanford. In light of Judge Braman's well-supported findings and conclusions, we hold that it was within the authority of the trial court to order Potomac Creek to sign the Definitive Agreement, as Judge Braman found that Potomac Creek was obligated to do under the Preliminary Agreement.

## III. Other Grounds for Affirmance

Having decided that the trial court had authority to grant specific performance of the Preliminary Agreement, we briefly consider-and reject-appellee's alternative grounds for affirmance: (1) that Stanford has not shown that money damages would not be adequate; (2) that Stanford has not proven that it was ready, willing and able to perform; and (3) that Judge Braman's finding that the parties' obligation under the Preliminary Agreement to negotiate in good faith was extended to September 18, 1998, was clearly erroneous.

### A. *Adequacy of Money Damages*

"Specific performance is appropriate where 'the legal remedy, usually money damages, is deemed to be either inadequate or impracticable.'" *Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 870 (D.C.2005) (quoting *Flack*, 417 A.2d at 400). The core purpose of the equitable doctrine of specific performance is to effect a "desire to do justice, which the legal remedy would fail to give." POMEROY, *supra*, § 1401, at 1033. In her order, Judge Hedge properly equated expectation damages with specific performance, in that both are for the purpose of "placing the aggrieved party in as good a position as it would have been had the contract been performed." Judge Hedge also correctly noted that even though the parties had entered into a preliminary Type II agreement, "[t]his may be the rare case in which a remedy based on the anticipated contract may be appropriate" because all the terms of the deal had been agreed upon. Finally, Judge Hedge recognized, specific performance is deemed particularly apt in the context of contracts

involving real property, especially where the property has unique features such as the Hotel. *See City Stores Co. v. Ammerman,* 266 F.Supp. 766, 776 (D.D.C.1967) (noting "clear inadequacy of damages" for breach of contracts "involving interests in land or unique chattels"); *see also Johnson v. Jones,* 109 Utah 92, 164 P.2d 893, 895 (1946) (preliminary agreement concerning land is specifically enforceable).

■ Here, Stanford invested considerable time, money, and effort in negotiating with Potomac Creek and conducting due diligence investigation because it wanted to acquire the Hotel, but Potomac Creek's breach of the Preliminary Agreement and bad faith actions frustrated Stanford from accomplishing its objective, and rendered valueless Stanford's investment of time, effort and expense. Stanford, which owned and managed sixteen "substantial" hotels, represented to the court that its interest was to acquire the Hotel for its operations, not merely to realize financial benefits from the transaction. Potomac Creek recognized this interest in the Definitive Agreement which provides, in Paragraph 9.3(b), that in the event that closing on the transaction did not occur as a result of Potomac Creek's breach, Stanford, at its option, may "require that Seller specifically perform its obligations."[11] Yet Potomac Creek would limit Stanford's remedies to damages. Although we agree that expectation damages can be an adequate remedy in some cases, they will not achieve substantial justice where the benefit of the bargain to the prevailing party is difficult to calculate or realize by the payment of money. As Judge Gasch noted in the context of breach of an agreement to lease space at the then-new Tysons Corner shopping center, "money damages would in no way compensate the plaintiff for loss of the right to participate in the shopping center enterprise and for the almost incalculable future advantages that might accrue to it as a result of extending its operations." *See City Stores Co.,* 266 F.Supp. at 776 (holding, as a matter of law, that "mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation ... will not bar a decree for specific performance, if in the court's discretion specific performance should be granted").

In view of the presumptive suitability of specific performance of contracts involving land, and based on the facts of record, we think that in this case the burden is more appropriately placed on Potomac Creek to show that money damages would have been adequate, rather than on Stanford to disprove that damages are inadequate. The trial court will need to determine whether expectation damages would have been adequate in this case, including what weight should be given to Stanford's decision to ask for specific performance as its sole remedy.

### B. *Ability to Perform*

■ Potomac Creek's second alternative ground for affirmance, that Stanford did not show that it was ready, willing, and able to perform, is also unavailing. As of trial, Stanford had demonstrated that it not only was "ready, willing, and able" to perform its obligations under the Preliminary Agreement, but that it had fully performed: Stanford had negotiated with Po-

---

11. As seller, Potomac Creek did not have a corresponding right to require specific performance of the contemplated transaction because its injury resulting from a failed sale of the Hotel due to Stanford's breach would be fairly compensable by monetary damages. *See, e.g., Kesler v. Marshall,* 792 N.E.2d 893, 896–97 (Ind.Ct.App.2003) (reversing grant of specific performance to *seller* of real property because seller "[wa]s not obtaining the property in the transaction, but rather only money").

tomac Creek, conducted due diligence, and signed the Definitive Agreement. Judge Braman found that Stanford was at that time willing to concede all four of the remaining issues left unresolved in the Declaration, see *supra* note 5, and that Stanford could obtain the necessary financing to complete the transaction from the Hong Kong and Shanghai Bank, with which it had an established relationship. Potomac Creek's argument on appeal that Judge Braman's finding was stale by the time of Phase II, and that Stanford did not then provide current assurances that it could perform, ring hollow when one considers that Potomac Creek's argument to Judge Hedge was that she lacked authority to grant specific performance, not that Stanford could not satisfy its end of the bargain. Having decided that an order of specific performance directed to Potomac Creek was not legally available to enforce the Preliminary Agreement, Judge Hedge did not address whether Stanford was able to conclude the transaction. The question whether Stanford is now able to perform the Definitive Agreement is a determination that the trial court will need to take into consideration in deciding whether to grant specific performance of the Preliminary Agreement by ordering Potomac Creek to sign the Definitive Agreement.

## C. *Term of Preliminary Agreement*

 Finally, we reject the argument that Judge Braman clearly erred in finding that the parties agreed to extend the 10–day time frame for completion of the Definitive Agreement—an agreement that eventually took several months to negotiate. Judge Braman interpreted the Preliminary Agreement's language that negotiations would proceed "with a view to signing a Definitive Agreement within ten (10) days" and concluded that it was "intended to be [a] goal[ ], not [a] procrustean deadline[ ]." In reaching this conclusion,

Judge Braman noted the absence of "time is of the essence" language in the Preliminary Agreement, contrasting it with the Definitive Agreement and the Declaration, both of which included such provisions, as well as the conduct of the parties, who "never acted as if they were under the pressure of a deadline." *See Drazin*, 395 A.2d at 35 (noting that when a date for performance is specified, but not made of the essence, a party may make performance essential on that date or subsequently, by giving reasonable notice to that effect). Moreover, Judge Braman found, any deadline was waived by Potomac Creek's conduct, pointing to its "extensive post-time line performance, including continuing negotiations on the Definitive Agreement and Declaration, the exchange of multiple drafts of both instruments and the supplying of due diligence materials" and Potomac Creek's "accept[ance of] Stanford's post-time line performance." An appellate court will not reverse trial court findings unless they are clearly erroneous or unsupported by the evidence. *See* D.C.Code § 17–305(a) (2001); *Independence Mgmt. Co.*, 874 A.2d at 867. Judge Braman's findings in this regard are logical, reasonable and amply supported by the evidence.

## IV. Remand

We have already mentioned several factors that the trial court did not reach, but will need to consider, in deciding whether to grant specific performance, in particular, the need for revisions to the operative documents and degree of court involvement required to oversee an order of specific performance. We note an additional circumstance in this case. On remand, the trial court will need to consider the passage of time and the creation of other, third-party interests in the Hotel. The grant of specific performance requires that

the court consider whether Stanford acted with "reasonable promptness" in seeking specific performance as a remedy for Potomac Creek's breach. The record shows that Sarakreek informed Stanford that it had chosen to refinance the Plaza property on October 9, 1998. By that point, title to the Hotel would have transferred pursuant to the refinancing. Stanford filed suit on April 1, 1999, and an amended complaint on November 23, 1999. The deed of trust in the refinancing transaction with Credit Suisse was designed to be subject to "defeasance," a process by which the Hotel could be extricated from the financing arrangements. Judge Braman held hearings on the question and ordered that the primary lender and others with interests in the Plaza property (including the Hotel) be joined as indispensable parties. *See* Order of July 15, 2003.[12] According to submissions made by appellee to the trial court and appellant's brief to this court, the Plaza property subsequently has been re-refinanced and title transferred several times. Because Stanford filed a notice of *lis pendens* when it filed this appeal in 1999, subsequent purchasers have been on notice of Stanford's claims asserted in the litigation.

The litigation has been protracted, but there is no indication in the record that delay has been due to Stanford's lack of diligence. After Stanford's complaint was filed in 1999, Phase I of the trial court was substantively completed by Judge Braman's order of April 3, 2003; Phase II ended with Judge Hedge's order of April 2, 2007; this appeal followed.[13] All told,

almost thirteen years have passed since Stanford signed the Definitive Agreement and Potomac Creek would have signed it, had it been acting in good faith. It is generally known that in the last few years there have been wide fluctuations in the real estate market; whether properties such as the Hotel have been subject to such fluctuating values and, if so, whether and how that should affect this transaction is for the trial court to consider. *See Independence Mgmt. Co.*, 874 A.2d at 871 ("We . . . note that specific performance is an *equitable* remedy, and in this case we believe that equity supports the judge's decision. . . . Both parties were no doubt fully aware of th[e] reality [of fluctuations in real estate values], and neither is entitled to avoid its responsibilities simply because the bargain looked better to it [at the time the transaction was entered into]. Accordingly, equity favors specific performance of the contract."). It is for the trial court to decide the scope and manner of any further proceedings on remand that will assist the court in determining whether specific performance is appropriate at this time.

\* \* \*

We hold that specific performance is a remedy legally available to Stanford following Potomac Creek's breach of the Preliminary Agreement. Because Judge Hedge held only that specific performance could not be granted to enforce the Preliminary Agreement and did not decide whether specific performance was war-

---

12. Stanford filed a notice of appeal of Judge Hedge's separate grant of summary judgment to the lenders joined as indispensable parties. This became appeal No. 07–CV–480. Once these parties no longer had a financial interest in the Hotel, the joined parties were no longer "indispensable," and were dismissed by consent. See Order dated July 19, 2007. We, therefore, dismiss appeal No. 07–CV–480.

13. After the appeal was filed, the parties were referred to the court's then-mandatory mediation program. On September 24, 2007, the assigned mediator, Judge Nan R. Shuker, informed the court that the parties could not come to agreement, and the appeal was scheduled for briefing and oral argument.

ranted in this particular case, we remand the case for further proceedings consistent with this opinion.

*So ordered.*