# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2015        Decided August 18, 2015

No. 14-7030

BANNEKER VENTURES, LLC,
APPELLANT

v.

JIM GRAHAM, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00391)

*Mark A. Grannis* argued the cause for appellant. With him on the briefs were *Mark D. Davis* and *Anne K. Langer*. *Brian K. McDaniel* entered an appearance.

*Douglas M. Bregman* argued the cause for appellee Washington Metropolitan Area Transit Authority. *Daniel P. Golden*, Assistant General Counsel, Office of the General Counsel for the Council of the District of Columbia, argued the cause for appellee Jim Graham. With them on the joint brief were *Geoffrey T. Hervey*, *Gerard J. Stief*, *V. David Zvenyach*, General Counsel, Office of the General Counsel for the Council of the District of Columbia, *John R. Hoellen*, Deputy General Counsel, and *Manasi Venkatesh*, Assistant General Counsel, *Brian L. Schwalb*, *Seth A. Rosenthal*, and

*Moxila A. Upadhyaya*. *Bruce P. Heppen* entered an appearance.

Before: MILLETT and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: The Washington Metropolitan Area Transit Authority (WMATA), like many transit authorities across the country, does more than build and run transit systems. WMATA is empowered to acquire, own, and convey real property to promote transit-oriented development. One way it does so is through a program that invites developers to submit proposals to develop WMATA property, and then grants the competitively selected developer an exclusive period during which to negotiate for a final development contract to carry out its proposal.

Plaintiff in this case, real estate developer Banneker Ventures, LLC, alleges that WMATA signed a contractually binding Term Sheet preliminarily selecting Banneker to develop property above a Metrorail station and giving Banneker the exclusive right to negotiate a final development agreement. Banneker further alleges that one of WMATA's Board Members, Jim Graham, abused his Board position and his seat on the Council of the District of Columbia to work behind the scenes with one of Banneker's rival bidders, LaKritz Adler Development, to derail WMATA's negotiations with Banneker. According to Banneker, Graham sought to steer the development job to LaKritz Adler, a Graham supporter and campaign contributor. WMATA dragged out its negotiating period with Banneker for many months during which, the complaint alleges, Banneker met WMATA's every shifting demand. WMATA then let the

Term Sheet expire without consummating a final development agreement. WMATA eventually sold the property to another developer.

Banneker raises several distinct claims arising from its dashed opportunity. It asserts that WMATA, through Graham, breached the Term Sheet's exclusivity provision and obligation to negotiate in good faith, and that Graham and LaKritz Adler conspired to interfere with Banneker's contract (the Term Sheet) and prospective business advantage. The complaint exhaustively chronicles the facts underlying those claims and, for the reasons discussed below, we conclude that the district court erred in dismissing them.

Banneker also asserted tort claims against WMATA and Graham. We affirm the district court's dismissal of Banneker's fraud claim against WMATA as barred by sovereign immunity. Graham's asserted absolute official immunity from suit for tortious interference requires further consideration. The district court evaluated the complaint at too high a level of generality and failed to place the burden on Graham to establish his entitlement to official immunity. Because the absolute official immunity questions have yet to be analyzed by the district court at the requisite level of factual specificity, we vacate the dismissal of the tort claims against Graham and remand for further proceedings consistent with this opinion.

## I. Background

### A. Allegations[1]

In the spring of 2007, WMATA invited bids to redevelop its property above the Shaw-Howard/Florida Avenue Metrorail station. Banneker, Defendant LaKritz Adler Development, and ten other developers submitted bids. Banneker proposed building "The Jazz at Florida Avenue," a mixed-use development that would include 103 new residential units and 11,750 square feet of retail space. At first, things seemed to go Banneker's way. Its bid received the support of the local neighborhood commission, investors expressed interest, and Banneker's presentation to WMATA staff was well received. WMATA made its initial selection of Banneker to develop the site, and the parties negotiated a Term Sheet that contained many of the material terms of the deal and a contractually guaranteed, exclusive, five-month negotiating period for Banneker and WMATA to arrive at a final development agreement. *See* Term Sheet, J.A. 111 §§ 4, 7, 12. Banneker paid WMATA $100,000 in exchange for the exclusive negotiation right, which fee was in addition to the $100,000 it had already paid as a "proposal deposit."

After its preliminary success, Banneker soon met resistance. Defendant Jim Graham was a member of the D.C. Council and one of the District's two voting members on

---

[1] This factual account is based on the allegations of the Amended Complaint. J.A. 10. At the pleading stage, we accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The question is whether Banneker will have an opportunity to try to prove in court what it has alleged. We express no opinion as to the truth of what is recited here as fact.

WMATA's Board of Directors.[2]  LaKritz Adler and its principals Joshua Adler and Robb LaKritz (collectively, LaKritz Adler) were major contributors to Graham's campaigns and projects, whereas Graham believed that Banneker contributed to his political opponents.  From the start, Graham opposed Banneker and favored LaKritz Adler for the Florida Avenue project.  Graham and LaKritz Adler colluded for the next two years to engineer an opportunity for LaKritz Adler to wrest the contract or some of its benefits from Banneker.  That alliance was only half successful: Banneker ultimately lost the project, but a different developer, not LaKritz Adler, took its place.

Starting while WMATA's staff was negotiating the Term Sheet with Banneker, Graham sought to derail the process. Graham told one of Banneker's principals, Warren Williams, that Graham would cast his D.C. Council vote in favor of Williams on a lottery contract he sought if Williams would pull Banneker out of the WMATA project.  Graham solicited campaign contributions and substantial financial support from another Banneker principal in exchange for Graham's support of the Banneker bid.  Graham also pressured two of Banneker's development partners to drop off of the project in an effort to cause WMATA staff to abandon negotiations with Banneker and give the project to LaKritz Adler instead.

Meanwhile, Banneker was in negotiations with Howard University over a parcel adjacent to the WMATA Florida

---

[2] WMATA is governed by a Board of Directors composed of eight members, two from each signatory of the interstate compact that formed it—the District of Columbia, Maryland, Virginia—and two from the federal government. D.C. Code § 9-1107.01 ¶ 5(a).  The Board acts through majority vote but, in order for a vote to carry, the majority must contain at least one member of each contributing jurisdiction. *Id.* ¶ 8(a).

Avenue property that Banneker wanted to develop at the same time as the WMATA project. LaKritz Adler falsely told Howard University that WMATA had already selected it to develop the Florida Avenue property, not Banneker. Graham also pressed Banneker at a lunch meeting to add LaKritz Adler to its development team, claiming that doing so would be a precondition of Board approval of the Term Sheet. Immediately following the lunch, Banneker received unsolicited calls and e-mail messages from LaKritz Adler proposing transfer of Banneker's option on the adjacent parcel to LaKritz Adler—timing that Banneker alleges shows Graham's collusion with LaKritz Adler.

In June 2008, WMATA's Board of Directors approved the Term Sheet and Banneker executed it. But Graham did not give up. He pressured his fellow WMATA Directors in a closed-door session to impose an affordable housing requirement on Banneker that, based on his experience, Graham anticipated would "delay, interfere with or otherwise scuttle Banneker's efforts during the" negotiation period to follow. Am. Compl. ¶ 88. Graham also directed WMATA staff to "stop or delay negotiations" so as to "delay or destroy Banneker's ability to fully realize the benefit of its period of exclusive negotiation." *Id.* ¶ 127.

Upon becoming Chairman of the WMATA Board in January 2009, Graham "me[t] with WMATA's staff to pressure the WMATA staff to find a way for LaKritz Adler to be included" in Banneker's development plan. *Id.* ¶ 131. LaKritz Adler also called WMATA staff to tell them that now-Chairman Graham had asked LaKritz Adler to "make a deal" with Banneker. *Id.* ¶ 133. During the same period, Graham shared Banneker's confidential bid information with LaKritz Adler to provide the rival firm with a competitive advantage. Graham also forced a third Banneker

development partner to drop out of the deal through delay, and demanded that Banneker replace it with LaKritz Adler.

Graham used his power on the Board to delay and undermine negotiations between Banneker and WMATA staff over a final agreement. Repeatedly, when Banneker and WMATA staff reached agreement on material terms, and WMATA staff recommended that the Board approve a final agreement, Graham initiated changes or otherwise prevented closure. He delayed Board consideration of a final agreement, directed staff to stop negotiations, switched the deal from a lease to a sale and then back to a lease again, and ordered the staff to re-appraise the property, giving rise to a new round of negotiations.

It was in the midst of that extended back and forth that Banneker learned Graham had instructed the WMATA staff to "obtain Best and Final Offers from Banneker and the two other firms who WMATA [had already] considered before selecting Banneker," including LaKritz Adler. *Id.* ¶ 155. WMATA's General Counsel prepared a memo at Graham's request regarding whether WMATA had the authority to solicit "Best and Final" offers from other developers during the period that the Term Sheet set for exclusive negotiations between WMATA and Banneker. (The memo, however, concluded that WMATA could not do so until Banneker's exclusivity period expired.)

In January 2010, the Board instructed WMATA staff to negotiate a larger up-front fee from Banneker to develop the site, and extended the negotiation period again. Banneker agreed to the Board's terms. By March, "all material terms of the Revised Term Sheet, including price, were agreed to by Banneker and WMATA staff at which time the WMATA staff, for the final time, recommended that the WMATA

Board approve the agreement." *Id.* ¶ 166; *see also id.* ¶ 213. But, rather than approve the final agreement as the staff had negotiated it with Banneker, the Board indefinitely tabled approval of the deal "for the purpose of allowing Banneker's exclusive right to 'time out.'" *Id.* ¶ 174. WMATA then re-issued a solicitation for bids, this time for a sale of the site, and sold the property to another developer. WMATA returned half of the $200,000 in deposits Banneker had paid it.

After *The Washington Post* began reporting allegations that Graham tried to barter his D.C. Council vote and pressured Banneker and its development partners to drop out of the project, WMATA retained the law firm Cadwalader, Wickersham & Taft, LLP, to conduct an investigation. (The parties dubbed the resulting report the Bondi Report, after the Cadwalader partner Bradley J. Bondi, who was its lead investigator and author.) The Bondi Report concluded that Graham failed to remain impartial, showed favoritism toward a competing vendor, appeared to barter a WMATA project for his vote on the D.C. Council, and attempted to circumvent the WMATA Board by pressuring Banneker to drop out of the project. A separate report by the Director of the Office of Integrity and Oversight in the office of the District of Columbia Chief Financial Officer concluded that Graham's offer to support Williams to obtain the lottery contract was "inappropriate." *Id.* ¶¶ 9 & n.3, 109. The District of Columbia Board of Ethics and Government Accountability also investigated, and found sufficient evidence to conclude that Graham violated applicable ethical guidelines. As a result, the Council reprimanded Jim Graham—making that only the second time in the D.C. Council's thirty-eight-year history of home rule that the Council formally reprimanded one of its members.

## B. Procedural History

Banneker filed this lawsuit in 2013, alleging that WMATA breached the Term Sheet and the implied covenant of good faith and fair dealing by violating the exclusivity provision and negotiating without genuine intention of reaching agreement. Banneker also claims that WMATA staff defrauded Banneker by repeatedly telling Banneker's principals that a deal was close when staff members knew or should have known that the WMATA Board would not approve it. It further claims that Graham, LaKritz Adler, and that firm's principals engaged in civil conspiracy and tortious interference with Banneker's prospective business advantage and its contract with WMATA.[3]

The district court dismissed all of Banneker's claims at the pleading stage. The court held that Banneker had failed to state a claim against WMATA for breach of the contract or the implied covenant because, it concluded, Banneker did not adequately allege that WMATA negotiated with LaKritz Adler, and because the Term Sheet did not bind WMATA to execute a final development agreement. *See Banneker Ventures, LLC v. Graham*, 20 F. Supp. 3d 184, 198-201 (D.D.C. 2013) (*Banneker I*). The court also held that WMATA and Graham were immune from suit on the tort claims, and that Banneker failed adequately to state a claim against LaKritz Adler for tortious interference. *Id.* at 192-98; *Banneker Ventures, LLC v. Graham*, 19 F. Supp. 3d 231, 245-51 (D.D.C. 2014) (*Banneker II*). Banneker filed a timely notice of appeal. Our jurisdiction rests on 28 U.S.C. § 1291.

---

[3] The complaint also asserted claims for unlawful restraint of trade and unjust enrichment, and a civil conspiracy claim against WMATA, but Banneker does not press those claims on appeal.

## II. Legal Standards

We review *de novo* the district court's Rule 12(b)(6) dismissal of Banneker's claims. Fed. R. Civ. P. 12(b)(6); *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008). The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Except for allegations of fraud or mistake, *see* Fed. R. Civ. P. 9(b), we do not require "detailed factual allegations" for a claim to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). We accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Id.* Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do we assume the truth of legal conclusions. *Id.* Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it is not a "probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The *Twombly* Court stated that a well-pleaded complaint should be allowed to proceed "even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." 550 U.S. at 556 (internal quotation marks omitted). A complaint survives a

motion to dismiss even "[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). It is inevitable that the defendant's version will sometimes prove to be the true one, but that does not relieve defendants of their obligation to respond to a complaint that states a plausible claim for relief, and to participate in discovery.

Defendants moved to dismiss certain tort claims based on sovereign immunity. As it must on motions to dismiss for failure to state a claim, a district court considering a motion to dismiss for lack of subject matter jurisdiction accepts the allegations of the complaint as true. *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). Where necessary to resolve a jurisdictional challenge under Rule 12(b)(1), "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* Here, however, the district court did not purport to resolve any disputed facts, nor did it give notice to the parties of any intention to do so. We therefore review *de novo* the district court's dismissal on jurisdictional grounds, taking the allegations of the complaint as true. *Id.*

### III. Contract Claims

Banneker claims that WMATA breached its Term Sheet because Graham, acting as WMATA's agent, negotiated with LaKritz Adler in violation of Banneker's exclusivity rights. Banneker also asserts that WMATA violated the implied covenant of good faith and fair dealing by unilaterally abandoning negotiations before a final agreement was

reached.[4]  We hold that Banneker adequately stated both claims and accordingly reverse.

## A.  Breach of the Exclusivity Provision

WMATA concedes that the Term Sheet bound it to negotiate exclusively with Banneker, but argues that it never negotiated with LaKritz Adler and so never breached the agreement.  The complaint's allegations make a powerful circumstantial case to the contrary:  WMATA, through Graham, communicated frequently and in detail with LaKritz Adler concerning the Florida Avenue site.  Graham leaked to LaKritz Adler confidential information about Banneker's plans so that LaKritz Adler could develop a competitively attractive alternative to Banneker's proposal.  LaKritz Adler called WMATA staff directly and, during that call, pressed its interest in the project subject to the Term Sheet and discussed Banneker's confidential bid information.  Am. Compl. ¶ 261.  Before Banneker's Term Sheet expired, Graham sought to formally solicit bids from Banneker's competitors, including LaKritz Adler, during the exclusivity period.  Though WMATA did not follow through, it is reasonable to infer from all of those allegations taken together that Graham negotiated with LaKritz Adler regarding its possible development of the Florida Avenue site, in violation of the exclusivity term of WMATA's agreement with Banneker.

WMATA seizes on separate allegations that Graham also helped LaKritz Adler in its efforts to become part of Banneker's development team.  WMATA argues that neither Graham nor any other WMATA personnel entered into negotiations with LaKritz Adler to replace Banneker—only to

---

[4] In the district court, Banneker also claimed that the Term Sheet was a contract for conveyance of the property, but it does not press that claim on appeal.

see whether LaKritz Adler might join Banneker's team. Allegations pointing to Graham's efforts to help LaKritz Adler benefit by getting a piece of Banneker's projected work are not, however, inconsistent with allegations that Graham simultaneously sought to help LaKritz Adler to displace Banneker from the project altogether. Banneker is entitled to, and does, allege that Graham did both.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing

Banneker's second contract claim is that WMATA breached its obligation under the Term Sheet to negotiate in good faith by interposing terms and conditions extraneous to the Term Sheet and unilaterally abandoning negotiations toward a final agreement. The allegations of Banneker's complaint make clear that it had a contract that imposed on the parties a duty to negotiate in good faith. The parties' Term Sheet, although preliminary to any binding development contract, was itself a binding contract to negotiate. That acknowledged, contractually binding obligation to negotiate carried with it the implied duty to do so in good faith. *See Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006); Restatement (Second) of Contracts § 205 (1981); 23 Williston on Contracts § 63:22 (4th ed.).

Under an often-cited typology of preliminary agreements to negotiate final agreements, the Term Sheet was a "Type II" agreement, or one that "expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.); *see Stanford Hotels Corp. v. Potomac Creek Associates, L.P.*, 18 A.3d 725, 735-36 (D.C. 2011) (applying *Tribune*). In contrast to a Type

I agreement, which is "preliminary only in form" because the parties have reached "complete agreement" and need only to formalize it, *Tribune*, 670 F. Supp. at 498, parties to a Type II agreement have not reached complete agreement, but "can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement," *id.*

The Term Sheet on its face is manifestly a Type II agreement. The Term Sheet recites that it is "intended to summarize the principal terms of a proposal being considered by" the parties, and to express the parties' "wish to negotiate a Definitive Agreement." Term Sheet, Preamble. It states that its "binding effect" is to give Banneker "the exclusive right to negotiate a Definitive Agreement with WMATA." *Id.* § 12. And it sets forth many of the material terms of the deal, including the definition of the property to be leased, the base rent for the property, formulas for how the rent would change based on time, occupancy, and the density of the development, the security deposit Banneker would pay upon execution of a final agreement, an outline of the improvements Banneker intended to build on the property, and the corporate structure of the development team. Through the Term Sheet, Banneker and WMATA established "a general framework within which they could proceed while preserving flexibility in the face of future uncertainty," *Brown v. Cara*, 420 F.3d 148, 157-58 (2d Cir. 2005), and after executing the Term Sheet at significant expense to Banneker, they proceeded under that rubric.

As a Type II agreement, the Term Sheet did not guarantee the parties would reach complete agreement, but it was nonetheless binding. Type II agreements contemplate

that negotiations may fail, either because "good faith differences in the negotiation of the open issues may prevent a reaching of final contract" or because the parties *mutually* abandon the negotiation. *Tribune*, 670 F. Supp. at 498. But a duty to negotiate in good faith under a Type II agreement is violated by a party unilaterally "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.*; *see also Stanford Hotels*, 18 A.3d at 735-36 (quoting *Tribune*).

Banneker's allegations that Graham directed cessation of negotiations and interjected new terms and conditions that were not part of Banneker's Term Sheet suffice to show lack of good faith. According to the complaint, Banneker and WMATA staff reached final agreement on the open terms multiple times over twenty months, but the WMATA Board repeatedly altered the deal, delayed it, and ultimately tabled it for the purpose of letting the negotiation period "time out" with no final agreement. Those allegations show that WMATA "simply refused to proceed further" in the negotiations, even though it had no justification and no good faith disagreement had arisen with Banneker—conduct inconsistent with the duty of good faith. *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 344 (D.C. 2015); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430-31 (2d Cir. 2011). Much of Graham's alleged misconduct occurred before Banneker and WMATA executed the Term Sheet, but Graham also acted to interfere with Banneker's ability to secure a final agreement during the twenty months of negotiations after the Term Sheet was signed. He pressured Banneker to drop a development partner in favor of LaKritz Adler, instructed WMATA staff to stop or delay negotiations, and explored the possibility of soliciting more bids.

The decisions in *Tribune, Stanford Hotels*, and *United House of Prayer* are instructive. In *Tribune*, a prospective borrower's commitment letter established a Type II agreement to negotiate. 670 F. Supp. at 496, 499. When the borrower "broke off negotiations, declining to negotiate further unless the lender agreed" to a new term not anticipated by the commitment letter, the court found a breach. *Id.* at 491, 506. The court noted that the borrower had reserved to its Board of Directors the right to approve or reject the loan, but held that the borrower could not abuse that condition by going through the motions of negotiating the loan to the parties' mutual satisfaction, only to "defeat its obligations under the binding agreement of commitment merely by having its Board do nothing." *Id.* at 503. Similarly, in *Stanford Hotels*, the parties entered an agreement to negotiate the final purchase of a hotel. The seller thereby "obligated itself to negotiate exclusively and in good faith with [the purchaser] *and to sign* a Definitive Agreement if they were able to agree on terms." 18 A.3d at 734-35. When the purchaser showed itself "willing to concede" on all of the open issues "if necessary to close on the sale," *id.* at 731 n.5, the seller who responded by holding out for a more advantageous alternative, stringing the purchaser along, and ultimately abandoning the negotiations, was in breach, *id.* at 731-33. In *United House of Prayer*, a party violated an enforceable Type II agreement when it "terminated discussions . . . without offering any explanation of what terms its lawyer purportedly found unacceptable and by declining to negotiate . . . or even to discuss the matter," even though the counterparty communicated its willingness to discuss any remaining issues or concerns. 112 A.3d at 344.

So too, here: Banneker's allegations that Graham, in his capacity as an agent of WMATA, acted to delay, interfere with, and ultimately defeat a final development agreement

between WMATA and Banneker adequately state a claim for breach of the implied covenant of good faith and fair dealing. Further, we find no relevance, in the context of the agreement at issue in this case, that WMATA's Board reserved for itself the right to approve or disapprove a final agreement. WMATA's Board approved the Term Sheet, which obligated WMATA to negotiate in good faith. As in *Tribune*, because WMATA had committed to negotiate the project to the parties' mutual satisfaction, it could not then "defeat its obligations under the binding agreement of commitment merely by having its Board do nothing." *Tribune*, 670 F. Supp. at 503.

WMATA responds, relying exclusively on the Bondi Report, that it was not required to extend the negotiation period any further because the parties had reached an intractable, good faith impasse over contract terms. WMATA attached the Bondi Report to its motion to dismiss. In WMATA's view, the Bondi Report exonerates it of any claim of failure to negotiate in good faith because the report pegged the parties' failure to reach agreement under the Term Sheet on "business reasons." In particular, the report concluded that, while Graham acted unethically, there were good faith disagreements between Banneker and WMATA and other business reasons that prevented them from reaching a final development agreement. *See, e.g.*, Bondi Rpt., J.A. 140, at 50.

Defendants argue that we must assume the veracity of the Bondi Report, even at the pleading stage, by virtue of the incorporation-by-reference doctrine. Banneker's complaint refers to the Bondi Report, commissioned by WMATA and released in 2012, as a source of Banneker's knowledge of certain facts, such as Defendants' "behind-the-scenes and closed-door actions." Am. Compl. ¶ 81. Banneker did not

18

attach the report to its complaint or purport to endorse its overall analysis. Defendants contend that we must treat the report as adopted *in toto* by Banneker. We disagree.

Federal Rule of Civil Procedure 10(c) permits a plaintiff to attach an exhibit to the complaint, rendering the exhibit "part of the pleading for all purposes." Incorporation by reference can also amplify pleadings where the document is not attached by the plaintiff, but is "referred to in the complaint and [] integral to [the plaintiff's] claim." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment. *See id.*; 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (4th ed. 2014); *see also* Fed. R. Civ. P. 12(d).

The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself. Because the contract is a legally operative document that is a necessary element of the claim, the contract is "integral" to the plaintiff's claim—it "form[s] the basis for a claim or part of a claim." *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004) (internal quotation marks omitted).[5] A pleading's

---

[5] Defendants cite several cases similarly involving incorporation of documents upon which the plaintiffs' claims were based, the authenticity of which was not in question. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (incorporating advertising copy alleged to have been misleading); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (incorporating annual report where plaintiffs' claim rested on report's failure to disclose facts); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (incorporating documents alleged to contain misrepresentations

reference to even a part of a fully integrated and authentic contract thus incorporates the contract as a whole into the complaint.

The incorporation by reference doctrine has limits, however. If a document itself comes before the court only as an attachment to the defendant's motion to dismiss, it may not be appropriate for the court to treat the entire document as incorporated into the complaint. Some of our sister circuits have rejected the "fantastic argument" that "*all* facts contained in *any* attachments to a complaint are automatically deemed facts alleged as part of the complaint." *Carroll*, 362 F.3d at 986 (internal quotation marks and alterations omitted). Rule 10(c) "does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454-56 (7th Cir. 1998); *see also Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008); *West-Anderson v. Missouri Gaming Co.*, 557 F. App'x 620, 622 (8th Cir. 2014). For example, the Second Circuit has explained that a written contract "will defeat invocation of the Statute of Frauds, and a document that discloses what the complaint alleges it concealed will defeat the allegation of concealment," but a libel plaintiff who attaches to her complaint the allegedly libelous writing does not adopt the libelous statement as true, thereby defeating her own claim. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995). When considering incorporation, it is necessary to consider "why a plaintiff attached the

---

forming basis of plaintiff's claim); *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 47 (D.D.C. 2009) (incorporating contract where plaintiff's case rested on breach of contractual duty).

documents, who authored the documents, and the reliability of the documents." *N. Ind. Gun,* 163 F.3d at 455.

In evaluating Banneker's claims, we will not rely on those portions of the Bondi Report not adopted by Banneker. Banneker's claims here are not based on the Bondi Report. The report is not necessary to Banneker's claims. It was commissioned by a defendant and its reliability is unknown.[6] Banneker referred to some of the report's recitations to show how it learned some facts in the complaint, but it did not purport to and was not required to adopt the factual contents of the report wholesale.

Ignoring, as we must at the pleading stage, the opinions and conclusions of the Bondi Report, we find nothing in the complaint substantiating WMATA's position that Banneker has failed to state a claim for breach of the duty to negotiate in good faith.

## IV. Tortious Interference and Conspiracy Claims against LaKritz Adler

Banneker asserts claims against LaKritz Adler for tortious interference with contract, tortious interference with prospective business advantage, and civil conspiracy. To state claims for tortious interference under District of Columbia law, a plaintiff must allege the existence of a

---

[6] Defendants would have been entitled to rely on the Bondi Report to show any inaccuracy in Banneker's allegations about its contents, because a referenced document may always be read "to evidence what it *incontestably shows*." *Gant*, 69 F.3d at 674 (emphasis added). But that is not the same as treating the report's contents as though they were alleged by Banneker itself, and thus taking them all as true. And Defendants do not assert, in any case, that Banneker has mischaracterized the Bondi Report.

contract or business expectancy, the defendant's knowledge of the contract or business expectancy, intentional interference causing the breach of the contract or termination of the business expectancy, and damages. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 (D.C. Cir. 2002); *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995). Banneker argues that LaKritz Adler, acting in concert with Graham, (1) interfered with its Term Sheet by causing WMATA to breach its exclusivity and good faith obligations, and (2) interfered with its business expectancy in a final agreement by causing WMATA to abandon negotiations. The district court dismissed both tortious interference claims because it concluded that Banneker had alleged neither a valid contract nor a valid business expectancy. *Banneker II*, 19 F. Supp. 3d at 248-51. We hold that Banneker adequately stated its claims and therefore reverse.

First, our resolution of the contract claims establishes that Banneker alleges the existence of a valid contract. The district court held that the Term Sheet was not enforceable. As we have discussed, however, the Term Sheet was a valid Type II agreement that bound WMATA to negotiate exclusively and in good faith with Banneker.

Banneker also alleges a valid business expectancy in the completion of a final development agreement. A business expectancy "must be commercially reasonable to anticipate" before its loss may be actionable. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks omitted). In holding that Banneker lacked a valid business expectancy, the district court reasoned that, after signing the Term Sheet, Banneker could "only hope[] to enter into a final contract with WMATA" because the possibility that the Board would approve a final deal "was too remote to establish

a valid business expectancy." *Banneker II*, 19 F. Supp. 3d at 249. The district court relied extensively on *Carr v. Brown*, 395 A.2d 79, 82 (D.C. 1978). There, a real estate developer applied for a permit to relocate a portion of an alley and for a zoning variance that would enable him to develop his property. When another property owner and his attorney expressed their opposition and "incite[d] . . . area residents to oppose the alley closing and relocation," the developer sued them for losses caused by the resultant delay in approval of the permit. *Id.* at 83. The D.C. Court of Appeals held that the developer's business expectancy was "too remote, depending as [it does] on governmental approval," particularly because the opponents to the permit were "participating in procedures fixed by statute which specifically invite opposition." *Id.* at 84. *Carr* itself distinguishes its facts from the type of expectancy at issue here, as it expressly does not purport to apply to "a claim by the plaintiff that he has an expectancy of *doing business* with a governmental body and that expectancy is unjustifiably interfered with by the defendant." *Id.*

Here, by contrast, Banneker *was* doing business with WMATA. LaKritz Adler is alleged to have interfered with a prospective final agreement. We hold that it was commercially reasonable for Banneker to anticipate the consummation of the deal anticipated by the Term Sheet. Banneker had far more than a "hope" of closing the deal; the very purpose of the Term Sheet was to produce a final agreement. Indeed, Banneker and WMATA staff reached agreement many times. WMATA staff repeatedly recommended approval. And the Board had in the past rarely voted against a development agreement recommended by the staff. On these facts, as alleged, Banneker had a justified expectation that a development agreement would be finalized.

Banneker also adequately alleged the remaining elements of tortious interference. Banneker alleged that LaKritz Adler had knowledge of its Term Sheet, and therefore of its exclusivity rights and expectancy in a final agreement, and Banneker has also made the requisite "strong showing of intent," *Bennett*, 45 F.3d at 499 (internal quotation marks omitted), or "bad faith," *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads*, 565 A.2d 285, 292 (D.C. 1989) (internal quotation marks omitted). The allegations that LaKritz Adler and Graham embarked on a long campaign to induce WMATA to partly or wholly displace Banneker suffice to plead causation. And Banneker alleged that the campaign to undermine its bid caused WMATA to breach its exclusivity and good faith obligations, and ultimately cost Banneker the project.[7]

LaKritz Adler argues that Banneker failed adequately to allege that LaKritz Adler's conduct was the cause of any breach of the Term Sheet or WMATA's abandonment of negotiations because it is Graham who is alleged to have been the "primary wrongdoer in the entire affair." Appellee Br. 53 (quoting Appellant Br. 32). We disagree. Banneker alleges that LaKritz Adler "used [its] relationship with Graham to induce Graham and WMATA's staff and Board to breach its contract to negotiate exclusively with Banneker," Am. Compl. ¶ 270, and to cause WMATA to abandon negotiations. District of Columbia courts have adopted the Restatement's

---

[7] We reject the argument made by Defendants that LaKritz Adler could not have caused the failure of negotiations because WMATA was an independent decision maker. The crux of Banneker's claim against LaKritz Adler is that its conspiracy with Graham, a WMATA Board Member, impaired Banneker's competitiveness and prompted the Board to end the negotiations without consummating a final agreement. The merits of that theory must await the proof.

formulation of the claim of tortious interference. *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345 (D.C. 2015). The Restatement recognizes Banneker's inducement theory:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing . . . the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Onyeoziri v. Spivok*, 44 A.3d 279, 286-87 (D.C. 2012) (second ellipsis added) (quoting Restatement (Second) of Torts § 766 (1979) ("Restatement")); *see also* Restatement § 766B (defining tortious interference with prospective business advantage to include interference consisting of "inducing . . . a third person not to enter into or continue the prospective relation).

In support of its claim of tortious interference against LaKritz Adler, Banneker alleges a circumstantial case that LaKritz Adler, both by its direct actions and its inducement of Graham, undermined the exclusivity term and helped to scuttle any final development agreement with WMATA. Banneker alleges that LaKritz Adler was in frequent communication with Graham, that Graham leaked to LaKritz Adler confidential bid information, that LaKritz Adler, knowing that information to be confidential, used it in a phone call with WMATA, and that Graham sought to re-open the bidding process in the middle of Banneker's exclusivity period. In addition, Banneker alleges that LaKritz Adler was a major contributor to Graham's campaigns and projects, that it made contributions during Banneker's exclusivity period,

Am. Compl. ¶ 26, and that, despite knowing and understanding the nature of WMATA's exclusivity obligations, LaKritz Adler exercised its financial influence over Graham to induce WMATA to breach the exclusivity clause of the Term Sheet. Finally, Banneker alleges that LaKritz Adler made repeated calls to WMATA staff for the purpose of disparaging Banneker, *id.* ¶ 272, that it interfered in Banneker's attempts to develop the Florida Avenue site alongside a parcel owned by Howard University, and that it formulated a plan with Graham to delay and obstruct Banneker's negotiations with WMATA. At the pleading stage, those allegations, taken together, state a claim for inducement of WMATA's breach of the exclusivity term. *See supra* Part III.A. (discussing breach of contract claim). Banneker also alleges that LaKritz Adler's conduct and its inducement of Graham's conduct resulted in WMATA's ultimate abandonment of negotiations. Given the minimal showing required at this early procedural stage, those allegations suffice to state a claim for tortious interference with prospective business advantage.

Contrary to LaKritz Adler's position, Banneker need not allege inducement through egregious means, such as libel, slander, coercion, or disparagement. *See* Appellee Br. 55. "[I]nducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other." Restatement § 766 cmt. k. Such conduct may include "intimidation," but it also includes "persuasion," such as the persuasion coupled with financial influence alleged here. *Id.* § 766 cmt. h. Even were egregious means required, moreover, Banneker alleged not only that LaKritz Adler stayed in frequent communication with Graham, but also that it called WMATA staff "every few months to disparage Banneker while attempting to convince WMATA" to give LaKritz Adler the project. Am. Compl. ¶ 272.

Nor may LaKritz Adler claim as a defense that it was merely pursuing its "financial interest." Appellee Br. 57. In the District of Columbia, the defendant bears the burden of establishing legal justification or privilege for the inducement of a breach. *Onyeoziri*, 44 A.3d at 287. Economic competitors are free to use means that are not wrongful to cause third parties not to enter into prospective contractual relations "or not to continue an existing contract terminable at will." Restatement § 766B. "A party may not, however, under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor." *Dunn v. Cox*, 163 A.2d 609, 610 (D.C. 1960) (internal quotation marks omitted); *see also* Restatement § 766B cmt. h ("[W]hen B is legally obligated to deal with C, A is not justified by the mere fact of competition in inducing B to commit a breach of his legal duty.").

Here, Banneker alleges that its contract with WMATA was not terminable at will. The Term Sheet secured to Banneker an exclusive negotiation period designed to bring about a final agreement. LaKritz Adler allegedly knew of the exclusivity term, but induced WMATA, through Graham, to breach that term. And LaKritz Adler's means of inducement—financial influence and persuasion—would, if substantiated, suffice to make out a claim against LaKritz Adler. *See Chaves v. Johnson*, 335 S.E.2d 97, 103 (Va. 1985); *cf. Angle v. Chicago, St. P., M. & O. Ry. Co.*, 151 U.S. 1, 14 (1894) (citing *Lumley v. Gye*, 2 El. & Bl. 216, 118, Eng. Rep. 749 (Q.B. 1853)); *Beekman v. Marsters*, 80 N.E. 817, 819 (Mass. 1907).

We conclude that Banneker, at this early procedural stage, has stated claims for interference with contract and

prospective business advantage.[8]  We therefore reverse the district court's dismissal of Banneker's tortious interference claims against LaKritz Adler.  Because LaKritz Adler does not argue that the conspiracy claim is otherwise inadequately stated, we also reverse the dismissal of that claim.

## V. Tort Claims and Sovereign and Official Immunity Defenses

Banneker asserts a fraud claim against WMATA, alleging it misled Banneker as to its chances of securing Board approval.  Banneker also asserts claims for tortious interference and civil conspiracy against Graham for his attempts to undermine Banneker's bid.  The district court

---

[8] We also reject LaKritz Adler's argument that its conduct is shielded by the *Noerr-Pennington* doctrine, "under which petitioning the Government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in court, is immune from liability." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005).  To our knowledge, we have never applied the *Noerr-Pennington* doctrine, which arose in the context of the antitrust laws, to bar liability for common law torts; Defendants cite no case to the contrary. *Cf. Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995).  Even were we to do so now, and we take no position on the matter, the doctrine does not apply to parties "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).  "Private efforts to influence governmental bodies acting in an economic rather than a political framework, *e.g.*, a governmental procurement agency, have been held unprotected" because they are business, not political, activity. *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981); *see also George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir. 1970).

dismissed those claims for lack of subject matter jurisdiction on the ground that WMATA and Graham enjoy immunity from suit. We affirm as to WMATA but vacate and remand as to Graham.

## A. WMATA's Sovereign Immunity From Claims of Fraud During Negotiations

Banneker alleges that it relied to its detriment on WMATA's rosy predictions of Banneker's chances of securing a final deal, and that WMATA should have disclosed Graham's attempts to prevent the deal from closing.[9] The district court held that Banneker's fraud claim against WMATA was barred by sovereign immunity. We affirm.

WMATA, a quasi-governmental entity created by an interstate compact, is protected against common law tort actions by sovereign immunity. *See KiSKA Construction Corp., N.S.A. v. WMATA*, 321 F.3d 1151, 1158 (D.C. Cir. 2003). District courts lack subject matter jurisdiction to enter judgment against WMATA unless its limited waiver of immunity applies. *Id.* Section 80 of the WMATA Compact waives immunity for contract claims and claims of torts "committed in the conduct of any proprietary function," but not torts committed "in the performance of a governmental function." D.C. Code § 9-1107.01(80); *see also KiSKA*, 321 F.3d at 1158. "Because it is difficult to distinguish between public and private sector functions with any precision," we ask whether the claim seeks to impose liability for conduct that is discretionary, in which case the claim is barred by immunity, or ministerial, in which case the claim may proceed—a dichotomy we have imported from the Federal

---

[9] Banneker's fraud claim against WMATA below was broader. We address here only the narrowed theory of liability for fraud that Banneker presses against WMATA on appeal.

Tort Claims Act. *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997); *see also Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997).[10] Discretionary duties generally "involve[] judgment, planning, or policy decisions" and are immunized as reflecting sovereign choices. *KiSKA*, 321 F.3d at 1159 n.9 (internal quotation marks omitted). Merely ministerial duties, which can "involve[] enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required," are treated as not exercising distinctively sovereign powers and so are not immunized. *Id.* (internal quotation marks omitted).

We apply a two-part test to determine whether WMATA's conduct is immunized as discretionary. Because "sovereign immunity does not bar suits based on an employee's failure to follow [a] prescribed course of conduct," we ask first whether "any statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* at 1159 (internal quotation marks omitted). If the tort claim arises from a WMATA employee's failure to act as the law specifically prescribes, the conduct is not shielded by immunity. If the law leaves the conduct in question to the official's discretion, we then ask "whether the exercise of discretion is grounded in social, economic, or political goals." *Id.* (internal quotation marks omitted). Only actions grounded in such discretion retain "governmental function" immunity.

Our decision in *KiSKA* governs Banneker's fraud claim against WMATA. There, a contractor on a tunnel project

---

[10] We have also held that "quintessential" governmental functions such as law enforcement are entitled to immunity. *See Beebe*, 129 F.3d at 1287. WMATA concedes that Banneker's fraud claim is not directed at the performance of a quintessential government function.

sued WMATA for fraud, claiming that WMATA's Invitation for Bids (IFB) failed to disclose the report of a technical expert that WMATA had retained in developing the IFB's requirements. *Id.* at 1154-55. The contractor alleged that its project cost double its bid, and that it would have bid differently had WMATA disclosed the expert's report recommending more extensive measures for keeping the tunnel dry. *Id.* at 1155-56. In the absence of "any statute, regulation or policy that 'specifically prescribe[d]' the content of WMATA's IFBs," and because the duties of good faith and fair dealing and of accurate project description did not "specifically prescribe" that content, the court held that WMATA retained "broad discretion to determine the contents of the tunnel project's bid package." *Id.* at 1160. WMATA was thus immune.

The same is true here. The parties agree that WMATA has broad discretion to select appropriate bidders and to negotiate final agreements. Banneker argues only that WMATA lacked the discretion to lead bidders to believe they would receive approval from the Board when, in fact, one of its Board Members was actively working to prevent it. Nothing of which we are aware, however, so limits WMATA's discretion. *See also Greenbelt Ventures LLC v. WMATA*, 481 F. App'x 833, 839-40 (4th Cir. 2012) (holding no statute, regulation, or policy governed WMATA's course of conduct while negotiating joint development agreement); *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 78 (D.D.C. 2008). Banneker invokes the WMATA Standards of Conduct for Board Members, but it does not argue that those standards apply to WMATA staff. It is only the conduct of the staff that Banneker challenges with its fraud claim.

Banneker does not contend that WMATA's challenged conduct, if discretionary, is nonetheless not immunized.

Banneker apparently accepts that whatever discretion WMATA exercises in selecting bidders and negotiating agreements is the kind of discretion that is "susceptible to policy judgment," and so immunized. We therefore affirm the district court's dismissal of Banneker's claim for fraud against WMATA because it is barred by sovereign immunity.

## B. Graham's Official Immunity Defense to Tort and Conspiracy Claims

Graham's immunity is a more complicated matter. As it does against LaKritz Adler, Banneker asserts claims against Graham personally for tortious interference with prospective business advantage and contract, and for civil conspiracy.[11] By virtue of his role as a member of WMATA's Board, Graham enjoys absolute official immunity for discretionary conduct within the scope of his office. The district court dismissed all of Banneker's claims against Graham as barred by immunity. We find that the district court committed three errors: The court failed to apply federal common law to Graham's claim of immunity, it failed to place the burden on Graham to establish his entitlement to immunity, and it analyzed Graham's conduct at too high a level of generality. Because the record and briefing before us do not enable us definitively to apply the correct immunity analysis to the claims against Graham, we vacate the district court's dismissal of the claims against Graham and remand for further proceedings.

"When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to

---

[11] Banneker asserted the same claims against Graham in his official capacity, but does not press those claims on appeal.

the objective and independent criteria that ought to guide their conduct." *Forrester v. White*, 484 U.S. 219, 223 (1988). Absolute official immunity is thus meant "not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988). Even so, immunity "comes at a great cost," as it contravenes "the basic tenet that individuals be held accountable for their wrongful conduct." *Id.* The Supreme Court "has generally been quite sparing in its recognition of claims to absolute official immunity," *Forrester*, 484 U.S. at 224, and has held absolute official immunity "justified only when the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens," *Westfall*, 484 U.S. at 295-96 (internal quotation marks omitted). We are careful not to "lose sight of the purposes of the official immunity doctrine" when determining if an official is, in the context of a particular case, entitled to absolute immunity. *Id.* at 299-300.

We have repeatedly held that the federal common law of absolute immunity governs the scope of immunity for WMATA officials. *E.g.*, *Griggs v. WMATA*, 232 F.3d 917, 920 (D.C. Cir. 2000); *Beebe*, 129 F.3d at 1288. The district court here applied the law of the District of Columbia to determine whether Graham is entitled to absolute immunity. *See Banneker II*, 19 F. Supp. 3d at 246-48. That holding is in error, and requires reversal to the extent that District of Columbia immunity law produced a different result than that which would have obtained under federal law.

In weighing claims of absolute immunity, we apply the two-part test of *Westfall v. Erwin*.[12]  WMATA officials enjoy absolute immunity when their conduct falls "within the scope of their official duties *and* the conduct is discretionary in nature."  *Westfall*, 484 U.S. at 297-98; *see also Beebe*, 129 F.3d at 1289.  The Supreme Court has endorsed a "functional" approach to the inquiry.  *Forrester*, 484 U.S. at 224; *see also Barr v. Matteo*, 360 U.S. 564, 573-74 (1959).  The burden of establishing immunity must be borne by the official claiming it.  *Westfall*, 484 U.S. at 299.

### 1. Scope of Official Duties

Banneker asserts that all of Graham's allegedly tortious conduct fell beyond the scope of his official duties, and is thus not immunized under *Westfall*.[13]  Our inquiry into the scope of an official's duties depends "not [on] the title of [the] office but the duties with which [the official] is entrusted."  *Barr*, 360 U.S. at 573 (internal quotation marks omitted).  Conduct that is at least "within the outer perimeter of [an official's] line of duty" is shielded by absolute immunity.  *Id.* at 575; *see also Griggs*, 232 F.3d at 922.  By contrast, an official loses the protection of immunity when he crosses that line and acts in a manner that is "manifestly or palpably beyond his authority."  *Simons v. Bellinger*, 643 F.2d 774,

---

[12] *Westfall* was superseded by statute for claims brought under the Federal Tort Claims Act, but still applies to claims of personal liability against WMATA officials.  *See Beebe*, 129 F.3d at 1289.

[13] Banneker acknowledges the apparent tension between its theories that Graham acted within the scope of his employment for purposes of the contract claims against WMATA and beyond the scope of his official duties for purposes of immunity from his own personal liability for tort.  We need not resolve that tension now, at the pleading stage, because Banneker is permitted to plead both in the alternative.

786 (D.C. Cir. 1980) (quoting *Spalding v. Vilas*, 161 U.S. 483, 498 (1896)). One way that an official acts manifestly beyond his authority is through the use of "manifestly excessive means," even if he does so in the conduct of duties otherwise within his official purview. *McKinney v. Whitfield*, 736 F.2d 766, 769-70 (D.C. Cir. 1984) (emphasis omitted); *cf. Butz v. Economou*, 438 U.S. 478, 495 (1978).[14]

The district court considered all of Graham's alleged tortious conduct immune because it conceived of the inquiry at too high a level of generality. Rather than analyzing each challenged act, the district court read Banneker's complaint as attempting to impose liability on Graham for his "involvement[] as a WMATA Board Member . . . in setting contract terms for the development of the Site." *Banneker II*, 19 F. Supp. 3d at 248. The appropriate focus, however, is on the relationship between "the act complained of" and the corresponding "matters committed by law to [the official's] control or supervision." *Barr*, 360 U.S. at 573 (internal quotation marks omitted). At a high enough level of generality, almost any act that has any relationship to an overarching duty, such as the duty to vote on real estate projects, will be immunized. We must instead evaluate the relationship of each of the challenged acts to Graham's relevant, official duties. With respect to each act, we ask

---

[14] *See also Griggs*, 232 F.3d at 922 (officer empowered to make arrests was not immunized because he used manifestly excessive means when he commanded his dog to attack the plaintiff after the plaintiff complied with the officer's order, and failed to command the dog to cease its attack); *Bishop v. Tice*, 622 F.2d 349, 359 (8th Cir. 1980) (supervisors empowered to make employment decisions were not immunized because they "did not simply misuse their authority but went clearly beyond it by threatening [their employee] with criminal charges [in order to force him to resign] instead of attempting to dismiss him for cause").

whether it was among those entrusted to Graham and, if so, whether Graham's means of accomplishing his official duties were manifestly excessive. Graham is entitled to immunity only if he persuades us that each alleged act was taken appropriately in performance of a corresponding official duty.

Some of Banneker's allegations are aimed at the core of Graham's official duties. For example, Banneker alleges that Graham persuaded his fellow Board members to add an affordable housing requirement to the project when approving the original Term Sheet. That plainly constitutes an exercise of Graham's authority as a Board member to urge a Board resolution to impose conditions on development projects, and there is no allegation that Graham pursued the affordable housing requirement through excessive means.

Other allegations challenge conduct manifestly beyond Graham's authority. Banneker alleged that Graham sought to barter a vote in his capacity as member of the D.C. Council for his vote as a WMATA Board member on the Florida Avenue project, and attempted to extort Banneker. Those acts are manifestly beyond the authority of a WMATA Board Member and so not immunized.

That leaves allegations of particular acts by Graham that do not fall clearly within or without the outer perimeter of his official duties as we currently understand them. Banneker alleges that Graham exceeded the scope of his authority by leaking confidential bid information to LaKritz Adler in violation of applicable regulations, pressuring Banneker's development partners to drop out, pressuring Banneker to add LaKritz Adler to its team, seeking to steer the project to LaKritz Adler in violation of Banneker's exclusivity rights, and giving direction to WMATA staff in connection with the Florida Avenue project in violation of WMATA policy.

Banneker's allegations, however, are not enough for us to decide the question. The scope of Graham's duties is determined by "controlling law," *Butz*, 438 U.S. at 489, which here includes the WMATA Compact and the regulations governing WMATA Board Members' conduct. Graham bore the burden of establishing his entitlement to official immunity by reference to those sources of law and WMATA policy, but he made no effort in the district court to do so. The record does not contain, for example, any reliable information about the authority of a Board Member to direct WMATA staff, or to participate in or influence negotiations. Without that information, the district court was left only with Banneker's allegations.

Although the immunity issue may be identified through a motion directed to the pleadings, courts may, where appropriate, answer the question of whether an official has acted within the outer perimeter of official duties through limited evidentiary analysis focusing on the nature and scope of the job duties in question. The "functional analysis governing absolute immunity" may call for a "limited factual inquiry" to determine "in what role the challenged function was exercised" and "preclud[e] on occasion disposition at the Rule 12 stage." *Gray v. Bell*, 712 F.2d 490, 496 (D.C. Cir. 1983) (internal quotation marks omitted). For example, in some cases, affidavits from superiors elucidating an employee's duties are required to support "[t]his type of limited inquiry." *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 n.5 (D.C. Cir. 1977). In the context of the Federal Tort Claims Act, scope-of-employment questions sometimes are resolved in that manner. We have held that, in cases in which factual disputes over the scope of employment arise at the pleading stage, "limited discovery" may be appropriate. *See Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003). Such inquiries primarily

involve matters already known to the defendant official; they tend to be discrete inquiries, the general prospect of which is "unlikely to deter any official in the vigorous pursuit of his responsibilities," *Expeditions*, 566 F.2d at 292 n.5, and comport with the essential character of official immunity questions as ones that "should be decided at the earliest opportunity," *Osborn v. Haley*, 549 U.S. 225, 253 (2007).

In light of these principles, we hold that Graham failed to bear his burden to establish the scope of his official duties and to situate his conduct within its outer perimeter. On the limited record we have, we have little trouble concluding that the allegations of extortion and the alleged attempt to barter a D.C. Council vote for a WMATA vote manifestly exceeded the scope of Graham's official duties; we have equally little trouble concluding that Graham's attempt to add an affordable housing requirement fell within the scope of his official duties. The remaining allegations are more difficult, however, and require more fact-specific inspection. We therefore vacate the district court's dismissal and remand for the district court to consider in the first instance which of Graham's other actions fell beyond the outer perimeter of his official duties and whether those actions that did fall beyond the outer perimeter, taken together, state claims against Graham for tortious interference and civil conspiracy.

## 2. Discretionary Conduct

Turning to the second part of the *Westfall* analysis, Banneker argues that, even if all of Graham's conduct was within the bounds of his official duties, his conduct was not discretionary, and therefore not immune, because it violated the WMATA Standards of Conduct. As we have discussed in connection with WMATA's claim of sovereign immunity, we apply a two-part test to determine whether a decision is

immunized as discretionary. *See Beebe*, 129 F.3d at 1289 (applying sovereign immunity discretionary/ministerial dichotomy to claim of official immunity). First, we ask whether "any statute, regulation, or policy specifically prescribes a course of action for an employee to follow"; if so, the conduct is not shielded by immunity because it is not discretionary. *KiSKA*, 321 F.3d at 1159 (internal quotation marks omitted). If not, and the official has room to exercise discretion, we next ask "whether the exercise of discretion is grounded in social, economic, or political goals," making it an exercise of governmental judgment and so immune. *Id.*

The district court held that Graham had discretion in voting on Banneker's project, and considered all of Banneker's allegations as seeking to impose liability for the exercise of that discretion. Here, again, the district court reviewed the complaint at too high a level of generality. The correct analysis is whether "the alleged *tortious conduct* is discretionary." *Westfall*, 484 U.S. at 296 (emphasis added). Banneker does not seek to impose liability for Graham's vote on the project, but for various actions relating to the vote that Banneker alleges were prohibited by the regulations governing Board Members' conduct. The district court must parse Banneker's allegations at a finer level of specificity in order to address those claims of prohibited action and resolve Graham's claim of immunity.

The district court also held that the Standards of Conduct did not cabin Graham's discretion for purposes of immunity because they do not "prescribe" a course of action for WMATA Board Members to follow: they "describe how *not* to act, not how *to* act." *Banneker II*, 19 F. Supp. 3d at 246. We disagree. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "If [an] employee

violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). For example, we have observed that the limitation of an officer's judgment during a high speed chase—such as the limitation of "the speed of a vehicle in hot pursuit—indicates that the [police department] already had made the decision to limit the officer's exercise of discretion." *Biscoe v. Arlington Cty.*, 738 F.2d 1352, 1363 (D.C. Cir. 1984). Consequently, "effective law enforcement would not be hindered by enforced adherence to such regulations" through civil liability. *Id.*; *see also Keller v. United States*, 771 F.3d 1021, 1024 (7th Cir. 2014) (holding Federal Tort Claims Act discretionary function exception does not apply "if prison personnel violate a mandatory regulation"). We see no difference between a *prescription* by policy that leaves no room for choice and a *proscription* that does the same. In both cases, the public official's discretion is cabined such that violation of the regulation cannot by definition "involve[] judgment, planning, or policy decisions." *KiSKA*, 321 F.3d at 1159 n.9 (internal quotation marks omitted). Imposition of liability for operational actions that violate mandatory policies phrased as prohibitions, like liability for violation of policies phrased as affirmative duties, does not "pose threats to the quality and efficiency of government." *Biscoe*, 738 F.2d at 1363 (internal quotation marks omitted).

The Standards of Conduct are absent from the record, but Banneker alleges that the standards clearly prohibited Graham from leaking confidential information. Banneker also alleges that the Bondi Report concluded Graham violated the Standards of Conduct when he (1) created a conflict of interest by seeking to barter his D.C. Council vote on the lottery contract for his WMATA vote on Banneker's project,

and (2) showed favoritism to LaKritz Adler "by appearing to continue to support LaKritz Adler's proposal for, or inclusion in, the Florida Avenue Project while at the same time opposing Banneker Ventures." Bondi Rpt. 6. The Bondi Report's conclusions relied on and quoted portions of the Standards of Conduct that require Board Members to "strictly avoid engaging in actions which create conflicts of interest or the appearance of a conflict of interest" and state that it is "imperative that Board Members act impartially in their official conduct by avoiding any actions which might result in favored treatment or appearances thereof toward any individual, private organization, consultant, contractor or potential consultant or contractor." *Id.* at 2. Those portions of the Standards of Conduct purport to cabin the discretion of Board Members.

Graham's alleged leaking of confidential information manifestly violated the Standards. But, unlike the alleged prohibition on the leaking of confidential information, the conflict of interest standards quoted in the Bondi Report capture a wide swath of conduct more susceptible of contextual judgment. Some actions may fall clearly within the prohibition, such that the prohibition leaves "no room for choice," while others may fall into a gray area that cannot fairly be characterized as clearly "contrary to policy." *Gaubert*, 499 U.S. at 324. In the context of demarcating the scope of official duties, we have held that only conduct that is "manifestly or palpably beyond" the scope of official duties is unprotected by official immunity. *Simons*, 643 F.2d at 786 (quoting *Spalding*, 161 U.S. at 498). We hold that the same rule applies to the question of whether conduct is discretionary: Only alleged conduct that manifestly violates an ethical proscription or other statute, regulation, or policy that constrains the exercise of discretion may be subject to liability. Both the scope-of-duties and discretionary-conduct

inquiries thus leave unprotected only conduct that is plainly unauthorized.

As we have noted, the complete Standards of Conduct are not in the record. It may be that Graham's attempts to steer the project to LaKritz Adler manifestly contravened the regulations governing his conduct as a Board Member. It is also possible that the regulations were not so clear as to render Graham's conduct plainly beyond his discretion. Because the burden was Graham's to rebut Banneker's allegations, dismissal was inappropriate. *See, e.g.*, *Keller*, 771 F.3d at 1024-25 (reversing grant of summary judgment in FTCA suit on "scant record" of "what procedures and regulations applied" to employees for purposes of discretionary function exception because government bore burden of establishing entitlement to immunity).

However, without the benefit of the full Standards of Conduct and briefing from the parties, together with appropriate factual development, if any, that would clarify the scope of the relevant Standards and place Banneker's allegations in context, we cannot finally distinguish which of Banneker's allegations are barred by official immunity and which are not. For the same reason, we cannot decide in the first instance whether any allegations that are not barred by official immunity, taken together, suffice to state a claim for tortious interference and civil conspiracy. We therefore vacate the district court's dismissal of Banneker's claims against Graham and remand for further consideration in light of the foregoing principles.

\* \* \*

As we have discussed, Graham will not enjoy official immunity for any actions that either fall beyond the scope of his official duties or are not discretionary in nature. *See*

*Westfall*, 484 U.S. at 297-98; *Beebe*, 129 F.3d at 1289. On remand, the district court should evaluate, for each action complained of: (1) whether the alleged action, if established at trial, would be one that manifestly exceeded the scope of Graham's official duties or was carried out through manifestly excessive means; or (2) whether the alleged action, if established at trial, would manifestly violate any statute, regulation, or policy governing WMATA Board Members' conduct. Any action that would be unauthorized under either standard is unprotected by immunity. The district court should therefore evaluate whether the actions that it concludes would not be immunized, taken together, state a claim against Graham for tortious interference or civil conspiracy.

## VI. Conclusion

For the foregoing reasons, we reverse the district court's dismissal of Banneker's contract claims against WMATA and its tort claims against LaKritz Adler. We affirm the dismissal of Banneker's claim for fraud against WMATA, vacate the dismissal of Banneker's tort claims against Graham, and remand for further proceedings consistent with this opinion.

*So ordered.*